IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LAURA J. RUSSO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 09-86-GMS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

### I.    **INTRODUCTION**

This action arises from the denial of Laura Russo's ("Russo") claim for Social

Security disability benefits.  Russo applied for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

(the "Act") on February 16, 2006.  42 U.S.C. §§ 401-433, 1381-1383f.  In her

application and disability report, Russo claimed that she became disabled due to

anxiety attacks, depression, stress, and schizophrenia.  (D.I. 11 at 148.)  After the

Commissioner denied her application, Russo requested a hearing before an

Administrative Law Judge (the "ALJ").  (Id. at 64-79.)  Following the hearing, the ALJ

issued a written opinion on August 29, 2008, denying Russo's applications for DIB and

SSI.  (Id. at 6-16.)  Specifically, the ALJ found that Russo has affective disorder and

anxiety disorder, but has been able to perform past relevant work and sedentary to light

work limited nonexertionally by psychologically based symptoms at all relevant times.

(Id.)  Russo requested a review of the ALJ's decision by the Social Security Appeals

Council, which denied review on September 4, 2008.  (Id. at 1-5.)  On February 9, 2009,

Russo filed a timely appeal with this court. (D.I. 2.) Currently before this court are the parties' cross-motions for summary judgment. Because the court finds that the ALJ's decision meets the substantial evidence test established by 42 U.S.C. § 405(g), it will deny Russo's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the decision of the ALJ.

## II. BACKGROUND

Russo was born on December 17, 1976. (D.I. 11 at 96.) She was a twenty-nine year old female who was recently employed as a data entry clerk when she filed for DIB and SSI on February 16, 2006. (Id. at 21.) Russo's claim stems from episodes of anxiety attacks, depression, stress, and schizophrenia, which have required psychological attention since she was sixteen years old. (Id. at 45.) After filing her claim, Russo was also diagnosed with bipolar disorder. (Id. at 24.) Despite prescribed medications providing some benefit, Russo claims that she is still disabled under the Act. (Id. at 35.) To be eligible for DIB and SSI, Russo must demonstrate that she is disabled within the meaning of sections 216(i), 223(d) and 1614(a)(3)(A). (Id. at 9.)

### A. Evidence Presented

To support her claim, Russo produced her medical records regarding her condition. The court will summarize these records.

On November 11, 1998, Russo began seeing Dr. Aydin Z. Bill ("Dr. Bill"), a psychiatrist, every month or two. (Id. at 275.) Generally, Dr. Bill's records, which consist of brief, barely legible notations, provide comments on Russo's feelings and prescribed medications. (Id. at 266-75, 299-305.) His notes through June 2005 are

2

unremarkable, occasionally indicating that Russo was "more active", "feeling better," or "look[ing] good . . . back to her old self . . . ." (Id. at 269-75.) In a comment dated November 30, 2005, Dr. Bill relayed that Russo was put on two weeks leave after hearing a male voice, which she believed to be the devil, saying "'negative stuff' such as you'll not get better." (Id. at 268.) Thereafter, during office visits in December 2005 and January 2006, Russo claimed she was "feeling better," had a good holiday season, and was working as of January 11, 2006. (Id. at 267.)

At work on February 8, 2006, Russo experienced "depression and suicidal ideas" and was told "not to come back [to work until] cleared." (Id.) The following day, Russo checked into the MeadowWood Behavioral Health Systems for her auditory delusions, suicidal feelings, and major depression with psychotic features. (Id. at 221, 228.) At intake, Russo complained of daily panic attacks and constant worrying. (Id. at 260.) Her caretakers noted coherent, relevant, and spontaneous speech with an alert, consistent consciousness. (Id. at 261-62.) Russo was discharged from inpatient care on February 14, 2006, and placed on intensive outpatient care through March 1, 2006. (Id. at 229, 263.) Upon discharge, the MeadowWood staff reported that Russo "was generally cooperative and seemed to benefit from the groups and therapy. She gradually showed improvement with mood and the hallucinations." (Id. at 264.) On February 22, 2006, Russo expressed that she felt better, stated she would not attend more outpatient therapy, and was administratively discharged. (Id. at 265.) At that time, her diagnosis was "[m]ajor depression, recurrent, severe with psychotic features." (Id.) Additionally, the discharging doctor noted Russo's Global Assessment of

3

Functioning ("GAF")[1] rating "on admission of 20, at the time of discharge 50, [with the] highest in past year [of] 50." (Id.)

From March 22, 2006 through March 7, 2007, Russo continued treatment with Dr. Bill. (Id. at 299, 305.) Again, Dr. Bill's notes are limited and mentioned that Russo was not working, but was volunteering at a church. (Id. at 305.) Her visits on April 12 and September 7, 2006, indicated that Russo was "feeling better," "feeling good," and "pleasant . . . ." (Id. at 299, 305.)

Dr. Brian Simon ("Dr. Simon"), a licensed psychologist with the Delaware Disability Service ("DDS"),[2] completed a psychological evaluation of Russo on August 1, 2006. (Id. at 276-84.) Dr. Simon described Russo as having fair attention and concentration with normal, goal-directed speech and an appropriate activity level. (Id. at 278.) He continued that Russo's "memory was fair for immediate and poor for short-term material," but she could "perform serial calculations without making any errors," and she had "limited abstraction ability . . . ." (Id. at 279.) Ultimately, Dr. Simon felt that her judgment was fair with limited insight. (Id.) He noted her denials of any current

---

[1] The GAF is a scale ranging from zero to one hundred developed for use by mental health professionals as a means for expressing an adult's psychological, social, and occupational functioning. See AM. PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).

[2] DDS is a state administered federal program that serves Delawareans who are unable to work because of a disability. DDS is a state agency that is governed by the Social Security Administration and 100% federally funded. DDS develops, adjudicates, and processes disability claims of residents for Social Security disability benefits. DDS's disability adjudicators determine: (1) whether a person meets the statutory definition of a disability as defined in the Social Security Act and (2) whether the disabled individual meets medical eligibility to receive Social Security Disability Insurance or Supplemental Security Income. See generally www.delawareworks.com/dvr/services/dds.shtml.

hallucinations, suicidal or homicidal feelings, and significant feelings of depression. (Id.) He found Russo to be anxious. (Id.) Dr. Simon ruled out borderline intellectual functioning and reported that she could follow simple directions and had no difficulties getting along with people. (Id.) He did comment, though, that if Russo "were presented with a stressful work environment, there is a likelihood that this would exacerbate her symptoms of anxiety." (Id. at 280.) Dr. Simon rated her GAF score at fifty-four. (Id.)

On a DDS psychological functional capacities evaluation form, Dr. Simon diagnosed Russo with "general anxiety disorder, major depressive disorder, recurrent; moderate, in full remission (provisional) . . . ." (Id. at 283.) He determined her degree of impairment of: "[a]bility to relate to other people"; "[r]estriction of daily activities"; "[d]eterioration of personal habits"; and "[c]onstriction of interests" as being mild.[3] (Id.) Similarly, within the competitive labor-market setting, Dr. Simon concluded that her impairment to: "[u]nderstand simple, primarily oral, instructions"; "[c]arry out instructions under ordinary supervision"; and "[p]erform routine, repetitive tasks under ordinary supervision" was also mild. (Id. at 284.) Finally, he described Russo's impairment to: "[s]ustain work performance [and] attendance in a normal work-setting" and "[c]ope with pressures of ordinary work, i.e., meeting quality and production norms" within the competitive labor-market setting as moderate.[4] (Id.)

On September 20, 2006, a DDS psychologist completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") Assessment. (Id. at

---

[3] The DDS form defines "mild" as "suspected impairment of slight importance which does not affect ability to function." D.I. 11 at 284.
[4] The DDS form defines "moderate" as "an impairment which affects but does not preclude ability to function." D.I. 11 at 284.

285-98.)  The psychiatric review described the following "B" Criteria limitations:[5] a mild

restriction of daily living activities; mild difficulties maintaining social functioning;

moderate difficulties maintaining concentration, persistence, or pace; and one or two

repeated episodes of decompensation of extended duration were noted.[6]  (Id. at 293.)

The RFC assessment marked the following mental activities as "moderately limited":

"ability to understand and remember detailed instructions"; "ability to carry out detailed

instructions"; "ability to maintain attention and concentration for extended periods";

"ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods"; and "ability to set realistic goals to

make plans independently of others."  (Id. at 296-97.)  In conclusion, the DDS

psychologist found that Russo "appears to have achieved some resolution of the

psychiatric problems experienced earlier this year.  She is capable of low stress,

repetitive work."  (Id. at 298.)  On July 6, 2007, another DDS psychologist affirmed the

September 20, 2006 reports and noted "no indication of any change or worsening in

[Russo's] mental condition according to interim notes from [her] treating psychiatrist."

(Id. at 306.)

 As of November 21, 2007, Russo began seeing Dr. Suzy Nashed ("Dr. Nashed"),

a psychiatrist, due to Dr. Bill's retirement.  (Id. at 46, 323.)  At their first meeting, Dr.

---

 [5] "B" Criteria functional limitations result from an individual's mental disorders
and are found in paragraph B of listings 12.02-12.04, 12.06-12.08, and 12.10 and
paragraph D of 12.05 of the regulations for evaluation of mental impairments.  D.I. 11 at
293; see generally 20 C.F.R. Pt. 404, Subpt. P, App. 1.
 [6] None of the functional limitations listed met the "[d]egree of limitation that
satisfies the functional criterion."  D.I. 11 at 293.

Nashed observed how Russo was "easily irritated, mildly depressed, [and] anxious . . . ." (Id. at 322.) Dr. Nashed assessed that Russo's current GAF and highest GAF in the past year was fifty-five. (Id. at 323.) On December 5, 2007, Russo was more alert, motivated to do housework, and had a positive response to new medications, but worried about possible side effects. (Id. at 324.) Two days later, Russo was seen at the emergency room of Union Hospital of Cecil County complaining of anxiety stemming from a feeling that her "throat was closing." (Id. at 308, 313.) During the examination, Russo complained of "having relationship problems with her family" and expressed a desire "to get a job and move out of her parents' home . . . ." (Id. at 313.)

Russo continued her treatment with Dr. Nashed on December 26, 2007, at which time she was "doing 'a lot better . . . .'" (Id. at 327.) As of January 22, 2008, Russo continued "doing better" and felt motivated to do housework and go to the movies. (Id. at 329.) On February 26, 2008, Dr. Nashed wrote that Russo believed her medications were helping. (Id. at 331.) Dr. Nashed, however, reported that Russo's "thought process now reveals some residual psychosis" on March 18, 2008. (Id. at 334.) During the April 22, 2006 session, Russo expressed suicidal ideation when she was bored, but denied wanting to harm herself. (Id. at 335.) At the following office visit on May 9, 2008, Dr. Nashed, despite Russo reporting that she was "doing much better," diagnosed her as bipolar. (Id. at 337-38.) Russo's final medical record is an opinion written by Dr. Nashed on June 23 and 24, 2008. (Id. at 341-42.) Dr. Nashed felt that Russo should receive social security benefits, based on her "limited cognitive capacity," as evidenced by her previous six year work history and her present inability to follow

7

medication schedules. (Id. at 341)

## B. Hearing Testimony

1. Laura Russo's Testimony

At the July 23, 2008 hearing before the ALJ, Russo testified about her background, the nature of her disability, and her claim for disability benefits. (Id. at 20-42.) Specifically, Russo discussed her past employment as a data entry clerk, daycare worker, and fast food restaurant employee.[7] (Id. at 21-23.) Russo stated that she has been under the care of a psychologist since the age of sixteen for depression and anxiety. (Id. at 36.) She explained how on February 9, 2006, she became disabled. (Id. at 29.) Russo claims that she was anxious and experienced suicidal thoughts at work due to improper medication and was told not to return until she was better. (Id.) She explained how the stress of completing the required number of tasks at work, her anxiety from thinking about her problems, and her inability to focus on the job caused her disability. (Id. at 21, 30.)

Russo also testified about the course and extent of her medical treatment. (Id. at 35-36.) She stated that she was currently on medications,[8] which helped with her mental problems, but caused dry mouth. (Id. at 35.) She expressed no problems

---

[7] Russo's work history report, dated March 19, 2006, lists the following details about her prior work experience: (1) order clerk earning $6.50 per hour and working an eight-hour shift per day, five days a week from July to October 1995; (2) fast food worker at $6.00 per hour, eight hours per day, three days a week from November 1995 to April 1996; (3) daycare worker making $6.00 an hour, working eight hours per day, five days a week from February to April 1998; and (4) data entry clerk earning $7.88 per hour and working an eight-hour shift each day, three to four days per week from December 2000 to February 2006. D.I. 11 at 164-68.

[8] Russo listed Geodon, Cogentin, Klonopin (clonazepam), and Prozac as her current medications. D.I. 11 at 35.

8

getting along with people while on her current medications and had no overnight hospitalizations during the prior year. (Id. at 35.)

According to Russo, her activities include driving, going to Curves gym three days per week, swimming almost daily, grocery shopping, using a computer, bathing and dressing herself, doing some household chores, such as dusting and washing dishes, watching television, and reading. (Id. at 30-34.) Additionally, she attends church in the fall, visits the beach on the weekends during the summer, and occasionally babysits her nieces. (Id. at 34.)

2.     Jane Woerner's Testimony

Jane Woerner ("Woerner"), Russo's mother, also testified. (Id. at 42-51.) Generally, Woerner agreed with her daughter's testimony, including her description of her panic attacks and depression. (Id. at 43.) Woerner confirmed that Russo had been living with her for over a year. (Id. at 42-43.) She testified that Russo could not afford to live on her own, had kept her prior residence in a dirty and messy condition, and could not cook because she is unable to follow directions. (Id. at 43-44.) Although her daughter worked until February 9, 2006, Woerner related that because of anxiety (crying spells), Russo stopped working in November 2005, which prompted her filing for social security benefits. (Id. at 44.) Woerner felt that Dr. Nashed's medication plan has helped. (Id. at 49.) She related that when caring for children Russo can become "curt," which frightens the children. (Id.) As a result, another adult needs to be present. (Id.) Finally, Woerner confirmed that Russo's most recent panic attack occurred while she was country dancing. (Id. at 50.) During such attacks, which occur every month or two, Russo begins to sweat, feels ill, starts crying, and demands a doctor. (Id. at 50-51.)

9

### 3.    The Vocational Expert's Testimony

A vocation expert (the "VE") testified about Russo's background, skills and limitations, and the number of jobs available in the national economy that a person of Russo's age, education, and skills may perform. (Id. at 52-57.) Specifically, the VE testified that Russo had past relevant work as a data entry clerk, which is a sedentary, semiskilled position; and as a daycare worker, order filler, and fast food worker, which are light, unskilled employment. (Id. at 52-53.)

The ALJ posed four hypothetical situations to the VE. (Id. at 53-57.) In each hypothetical, the individual was thirty-one years old with a high school education; had the ability to read, write, and use numbers; and had Russo's past work history. (Id.) In the first hypothetical, the individual could also "understand detailed instructions adequately," and "sustain concentration, persistence, and pace at that level of complexity adequately." (Id. at 53.) According to the VE, that individual could perform light work, such as a non-government mail clerk or as a sedentary, unskilled information clerk, as well as perform all of Russo's past relevant work. (Id. at 53-54.) In the second example, the individual was limited to simple work without detailed instructions. (Id. at 54.) The VE opined that such a person could perform the same positions as the first individual, except the job of a data entry clerk. (Id.) Regarding the third situation, the VE was asked to assume that the individual could understand, remember, and carry out simple instructions, would have limited contact with the public and coworkers, and would not have a quota to fulfill. (Id. at 55-56). The VE concluded that such a person could perform medium exertion, unskilled positions, such as an industrial laundry worker or kitchen helper. (Id.) For the final hypothetical, the ALJ asked the VE to

10

assume that Russo's claims were fully credible, and described the individual as having

the following diagnoses and symptoms: "the effects of bipolar . . . manic depress[ion],

panic without agoraphobia . . . every claim of panic, depression, elation, attacks of just

not being able to stand up around people, being out in public, wanting to call an

ambulance and go to a mental hospital, somewhat erratic behavior". (Id. at 57.)  Based

on those assumptions, the VE responded that no jobs existed in the national economy

for such an individual because that person would miss a significant number of

workdays, could not deal with people and supervisors, and generally would not be able

to function.  (Id.)

### C.   The ALJ's Findings

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled:

> [The Commissioner] determines first whether an individual is
> currently engaged in substantial gainful activity.  If that
> individual is engaged in substantial gainful activity, he will be
> found not disabled regardless of the medical findings.  20
> C.F.R. § 404.1520(b).  If an individual is found not to be
> engaged in substantial gainful activity, the [Commissioner]
> will determine whether the medical evidence indicates that
> the claimant suffers from a severe impairment.  20 C.F.R. §
> 404.1520(c).  If the [Commissioner] determines that the
> claimant suffers from a severe impairment, the
> [Commissioner] will next determine whether the impairment
> meets or equals a list of impairments in Appendix I of sub-
> part P of Regulations No. 4 of the Code of Regulations.  20
> C.F.R. § 404.1520(d).  If the individual meets or equals the
> list of impairments, the claimant will be found disabled.  If he
> does not, the [Commissioner] must determine if the
> individual is capable of performing in his past relevant work
> considering his severe impairment.  20 C.F.R. §
> 404.1520(e).  If the [Commissioner] determines that the
> individual is not capable of performing his past relevant
> work, then he must determine whether, considering the

11

> claimant's age, education, past work experience and
> residual functional capacity, he is capable of performing
> other work which exists in the national economy.  20 C.F.R.
> § 404.1520(f).

*West v. Astrue*, C.A. No. 07-158, 2009 WL 2611224, at *5 (D. Del. August 26, 2009)

(quoting *Brewster v. Heckler*, 786 F.2d 581, 583-84 (3d Cir. 1986)).  Based on the

factual evidence and the testimony of Russo, Woerner, and the Vocational Expert, the

ALJ determined that Russo was not disabled and, therefore, was not eligible for DIB or

SSI.  (D.I. 11 at 16.)  The ALJ's Findings are summarized as follows:

> 1.      The claimant meets the insured status requirements
> of the Social Security Act through March 31, 2012.
>
> 2.      The claimant has engaged in substantial gainful
> activity since November 15, 2005, the alleged onset date (20
> CFR 404.1520(b), 404.1571 *et seq.,*416.920(b) and 416.971
> *et seq.*).
>
> 3.      The claimant has the following severe impairments:
> affective disorder and anxiety disorder (20 CFR 404.1520(c)
> and 416.920(c)).
>
> 4.      The claimant does not have an impairment or
> combination of impairments that meets or medically equals
> one of the listed impairments in 20 CFR Part 404, Subpart
> P, Appendix 1 (20 CFR 404.1520(d). 404.1525, 404.1526,
> 416.920(d), 416.925 and 416.926).
>
> 5.      [T]he claimant has the residual functional capacity to
> physically perform sedentary to heavy exertion.  However,
> this capacity is limited nonexertionally due to her
> psychologically based symptoms, she should avoid complex
> tasks and instructions as found in skilled work, but is able to
> understand instructions adequately, and maintain
> persistence and pace adequately.
>
> 6.      The claimant is capable of performing past relevant
> work as a data entry clerk, a day care provider, a fast food
> worker and an order clerk.  This work does not require the
> performance of work-related activities precluded by the

claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Id. at 11-16.)

## III.   STANDARD OF REVIEW

### A.     Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

### B.     Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence". *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means

such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.  DISCUSSION

In this appeal, Russo argues that the Commissioner did not have substantial evidence to support the denial of her application for DIB and SSI. (D.I. 16 at 2.) Russo first asserts that the ALJ erred in finding her capable of performing her past relevant work as a data entry clerk, daycare worker, fast food worker, and order clerk. (Id. at 8.) Specifically, Russo claims that she is unable to complete work as a data entry clerk and that her work experiences as a daycare worker, fast food worker, and order clerk were not relevant. (Id. at 8-11.) She also maintains that the ALJ's determination of her mental residual functional capacity is not supported by substantial evidence. (Id. at 11.)

14

Particularly, Russo argues that the ALJ improperly ignored her testimony and evidence, as well as, the statement of her husband, the testimony of her mother, and the records of her treating physician. (Id.) She further contends that the ALJ mischaracterized the testimony regarding her daily activities, and relied on the VE's answers to faulty hypotheticals. (Id. at 11-15.)

After considering the parties' arguments and submissions, the court finds that the ALJ properly found Russo capable of performing her past relevant work. Prior work experience qualifies as past relevant work "when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. §§ 404.1565(a), 416.965(a). "An individual who has worked only sporadically or for brief periods of time during the 15-year period, may be considered to have no relevant work experience." SSR 82-62, 1982 WL 31386, at *1 (1982). Past work experience indicates the ability to complete substantial gainful activity if the prior work "constituted [substantial gainful activity] and has current relevance considering duration and recency." Id. at *2. Substantial activity consists of "significant physical or mental activities" even if done on a part-time basis and involving lower wages, less work time, or less responsibility than prior employment. 20 C.F.R. §§ 404.1572(a), 416.972(a). To be gainful, work must be done for pay or profit, even if no profit is realized. Id. at §§ 404.1572(b), 416.972(b).

Conversely, an "unsuccessful work attempt" is not considered substantial gainful activity. Id. at §§ 404.1574(a)(1), 416.974(a)(1). Generally, a work attempt is unsuccessful if it lasted for six months or less and was terminated due to the claimant's impairment. See id. at §§ 404.1574(c)(1), 416.974(c)(1). Specifically, work lasting

three or less months is unsuccessful if terminated due to the "impairment or because of the removal of special conditions which took into account [the] impairment and permitted [the claimant] to work."[9] Id. at §§ 404.1574(c)(3), 416.974(c)(3). Also, work lasting between three and six months must have ended for the same reasons and included one of the following: (i) involved frequent absences due to the impairment, (ii) was unsatisfactory due to the impairment, (iii) took place during a temporary remission from the impairment, or (iv) was performed under special conditions essential to the claimant's performance and the conditions were removed. See id. at §§ 404.1574(c)(4), 416.974(c)(4). Regardless of the duration and reason for termination, a past work attempt must have been preceded by a "significant break in the continuity of [the claimant's] work" to be unsuccessful. Id. at §§ 404.1574(c)(2), 416.974(c)(2). Prior work is "'discontinued' for a significant period if," the claimant was "out of work at least 30 consecutive days" or if the claimant was "forced to change to another type of work or another employer" due to the impairment. Id.

The burden of proving that prior work experience should not be classified as past relevant work is on the claimant. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); see also 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). "The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3. When

---

[9] Russo does not claim that her prior work involved "special conditions" as defined in 20 C.F.R. §§ 404.1573(c) and 416.973(c), therefore, the existence of such conditions are not considered in the instant appeal.

faced with conflicting evidence of past work, the ALJ is tasked with weighing the veracity of each account. *See Cotter v. Harris*, 642 F.2d 700, 705-06 (3d Cir. 1981).

Initially, the ALJ gave proper weight to the evidence of Russo's work history, correctly determined that all four of her jobs constituted past relevant work, and accurately found her capable of performing her past relevant work.  It is undisputed that the six years as a data entry clerk constitutes past relevant work.  Thus, two issues regarding past relevant work remain for the court: (1) whether Russo is capable of performing her past relevant work as a data entry clerk; and (2) whether Russo's experiences as an order clerk, fast food worker, and daycare provider constitute past relevant work.

Russo argues that the ALJ improperly found her capable of working as a data entry clerk due to a faulty hypothetical. (D.I. 16 at 8-9.)  The court disagrees.  Russo claims that the ALJ's first hypothetical, which included a person capable of understanding "detailed instructions adequately," failed to impose mental functional limitations on the person. (Id. at 9.)  In so arguing, Russo compares this first hypothetical person to the ALJ's second individual, who was limited to simple work without detailed instructions and who, as the VE testified, could not work as a data entry clerk. (Id.)  Although the second individual is more limited, the first hypothetical person does not lack mental functional limitations. (D.I. 11 at 53.)  The ALJ properly limited this hypothetical person to "detailed" instructions, rather than complex instructions. (Id.)  Accordingly, because the ALJ found that Russo was not credible[10] (id. at 14-15) and

_____

[10] The ALJ may reject a claimant's subjective testimony regarding the severity of the claimant's symptoms if the ALJ does not find it credible so long as the ALJ explains

17

was capable of understanding non-complex, detailed instructions, the VE's testimony that Russo could perform her past relevant work as a data entry clerk constitutes substantial evidence.

Russo also contends that her prior work as an order clerk, fast food worker, and daycare worker do not qualify as past relevant work (D.I. 16 at 9-11): the court disagrees and upholds the ALJ's finding. Pursuant to *Bowen*, Russo has the burden of proving that her past work was not "relevant". *See* 482 U.S. at 146 n.5. As noted above, Russo's self-reported work history explains that she was a full-time order clerk for four months in 1995, a fast food worker for six months in 1995 and 1996, and a daycare provider for three months in 1998. (D.I. 11 at 164-68.) Russo has failed to adequately link the termination of these jobs with her purported mental impairments as required under 20 C.F.R. §§ 404.1574(c)(1) and 416.974(c)(1). Additionally, because her jobs as an order clerk and a fast food worker lasted more than three months, Russo has not proven any of the four additional factors required by C.F.R. §§ 404.1574(c)(4) and 416.974(c)(4). Furthermore, Russo has failed to establish that the period of unemployment between the order clerk and fast food worker positions was greater than thirty days as 20 C.F.R. §§ 404.1574(c)(2) and 416.974(c)(2) demand. The ALJ, therefore, appropriately found that Russo's prior experiences as an order clerk, fast food worker, and daycare worker qualified as past relevant work.

---

the reasons for rejecting such testimony. *See Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (1999). Here, the ALJ discounted Russo's subjectively claimed limitations to the extent they conflicted with Russo's activities of daily living, progress notes from her treating physicians, and DDS opinions regarding her impairments. D.I. 11 at 14-15.

Additionally, with due consideration given to the arguments and submissions of the parties, the court finds that the ALJ's RFC determination was supported by substantial evidence.  This determination covers three subissues: (1) whether the ALJ accorded Russo's treating physician's opinion proper weight; (2) whether the ALJ properly considered Russo's purported activities of daily life; and (3) whether the ALJ relied upon a faulty hypothetical.

The statutory standard for considering a treating physician's opinion clearly establishes that if a "treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  The Court of Appeals for the Third Circuit discussed the appropriate weight to be given to opinions of treating physicians in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999), where it held that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"[11]  186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).

In this instance, the ALJ gave proper weight to the medical opinion and objective

---

[11] The regulations require that the ALJ evaluate the following factors: (1) examining relationship; (2)(i) length of treatment relationship and the frequency of examination; (2)(ii) nature and extent of the treatment relationship; (3) degree to which evidence supports the opinion; (4) consistency of the record as a whole; (5) specialization of the physician; and (6) other factors.  *See* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

record evidence of Dr. Nashed. Compared to the record as a whole, Dr. Nashed's
opinion was speculative concerning the employability of Russo. (D.I. 11 at 15.) Dr.
Nashed's claim that Russo should receive social security benefits (id. at 341) is
contradicted by specific medical evidence. (Id. at 15.) Although Russo is impaired by
affective disorder and anxiety disorder, Dr. Nashed noted that Russo had a GAF of fifty-
five and that she was "feeling much better" at her last session. (Id. at 323, 337-38.)
Also, Russo responded well to her current medications. (Id. at 331.) Thus, Dr.
Nashed's own diagnosis indicates that Russo is not completely disabled. (Id. at 15.)
Furthermore, Russo's admitted activities further indicate that she is not totally disabled.
(Id. at 15.) Russo testified that she drives her own car, regularly goes to the gym,
swims daily, shops at the grocery store, uses the computer, bathes and dresses herself,
does housework, watches television, reads magazines, seasonally attends church and
visits the beach, and occasionally independently watches her nieces. (Id. at 30-34.)
Therefore, the weight the ALJ accorded to the opinion of Russo's treating physician was
proper.

Beyond objective medical evidence, a claimant's daily activities are relevant
factors that must be considered when determining the severity of a claimant's purported
symptoms. See 20 C.F.R. §§ 404.1520(c)(3), 416.929(c)(3). Instantly, the ALJ found
that Russo's "activities of daily living are not consistent with the alleged severity of her
symptoms." (D.I. 11 at 14.) In reaching this conclusion, the ALJ considered the lengthy
list of activities that Russo claimed she partook in on a regular basis. (Id.) For
purposes of this appeal, Russo asserts that the ALJ failed to balance her daily activities
with the depression, anxiety, and lack of motivation she allegedly feels while doing

20

chores. (D.I. 16 at 12.) As explained above, the ALJ properly in discounted Russo's subjective complaints of impairment by finding her not credible. *See Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (1999); D.I. 11 at 14-15. Accordingly, the ALJ properly relied on the list of Russo's daily activities during the RFC assessment.

Finally, in *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), the Third Circuit held that hypothetical questions to vocational experts must include any findings made by the ALJ in determining whether the claimant met the requirements of the listing of impairments.[12] *See* 273 F.3d at 554-55. Here, as Russo points out, the ALJ found that she "had mild restrictions in activities of daily living and in social functioning, moderate difficulties in concentration, persistence or pace and one to two episodes of decompensation in a year . . . ." (D.I. 19 at 1.) Russo argues that these restrictions and limitations were not adequately accounted for in any of the ALJ's hypothetical individuals who the VE accepted as not disabled. (Id. at 1-2.) The court is not persuaded by Russo's argument. The ALJ's third hypothetical person, who, as the VE testified, was not disable, is dispositive on this issue. (D.I. 11 at 55.) First, the individual was limited to receiving only simple directions, which accounts for mild restrictions of daily living and moderate difficulties in concentration. (Id.) Second, the ALJ established that the hypothetical person would need to have limited contact with the public and coworkers, which subsumes mild restrictions in social functioning. (Id.) Finally, the hypothetical individual was limited to employment with no quota

---

[12] As noted previously, the listing of impairments is documented at 20 C.F.R. Pt. 404, Subpt. P, App. 1.

requirement, which accounts for any persistence, pace, and decompensation concerns.

(Id.)  The ALJ, therefore, posed proper hypotheticals accounting for all of Russo's

credibly established limitations and ultimately relied on substantial evidence to support

a finding of not disabled.

## V.    CONCLUSION

For the aforementioned reasons, the court concludes that the ALJ's denial of DIB

and SSI is based on substantial evidence.  Accordingly, the court will deny Russo's

motion for summary judgment and grant the Commissioner's motion for summary

judgment.

Dated May _10_, 2010

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAURA J. RUSSO,                           )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )          Civil Action No. 09-86-GMS
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
              Defendant.                  )

## ORDER

At Wilmington, this _10th_ day of **May, 2010**

Consistent with the Memorandum Opinion issued as of this date,

IT IS ORDERED AND ADJUDGED that plaintiff's motion for summary

judgment (D.I. 15) is DENIED, and defendant's motion for summary judgment is

GRANTED.

_____
CHIEF, UNITED STATES DISTRICT JUDGE